THE PEOPLE *ex rel.* John J. Healy, State's Attorney,

*v.*

WILLIAM EUGENE BROWN.

*Opinion filed October 24, 1905—Rehearing denied Dec. 12, 1905.*

1. EVIDENCE—*what competent in disbarment proceeding.* Testimony of a witness called by the respondent in a disbarment proceeding to prove that a certain person to whom respondent claimed to have turned over a check for investigation had been in the employ of the witness as a detective, to the effect that he did not know any such person but that respondent attempted to suborn the witness and his clerks into testifying as to his existence, is competent, as being in the nature of an admission that no such person existed.

2. DISBARMENT—*what acts are ground for disbarment.* Manipulating checks in such a manner as to defraud a bank; attempting to suborn witnesses; purchasing property under false representations as to the financial standing of a client who the attorney claims owes him a large fee, and at once putting mortgages on the property which he succeeded in getting under his own control as receiver, are such acts as justify disbarment.

INFORMATION for disbarment.

JOHN J. HEALY, State's Attorney, (J. SCOTT MATTHEWS, and JOHN L. FOGLE, of counsel,) for relator.

WILLIAM EUGENE BROWN, *pro se.*

Mr. JUSTICE RICKS delivered the opinion of the court:

An information was filed in this court by the State's attorney of Cook county against the respondent, who is a practicing attorney and a member of the bar of this State, charging respondent with certain fraudulent practices and moving for his disbarment. The respondent answered the information, substantially admitting the acts charged against him but denying any fraudulent purpose or intent. The cause was referred to a master in chancery in Cook county and the evidence taken and reported to the court, and at the June term the cause was submitted upon oral and written briefs and arguments.

Respondent is a practicing attorney, the head of a family and resides in Chicago. He was admitted to the bar in the State of Kansas about the year 1881, and resided there and practiced law until about the year 1891, when he moved to Chicago and was in January of 1892 admitted to practice law in this State. By the record little is known of him from the time he came to this State until 1898. In July, 1898, he opened an account with the American Trust and Savings Bank in the name of Brown & Oakley, by depositing $2500 and arranging that the money should be subject to checks drawn by him only. Oakley was never a resident of this State, had no business interests here, and is said by respondent to have been engaged in the grocery and other business in the State of Kansas and to be a brother-in-law of respondent. Respondent's explanation of opening an account in this manner is that Brown & Oakley, under the name of Oakley only, were conducting a business in Kansas which respondent had financed; that the $2500 deposit was part of the proceeds of that business and was placed in the name of Brown & Oakley as a recognition of its firm ownership, although respondent asserts that Oakley and the firm owed respondent much more money than that amount; that Oakley, in fact, had no interest in it, and that it was entirely checked out and used by respondent. He admits that at that time there had been judgments and executions against him, and that while he kept personal accounts in other banks in his own name, he kept the balance in his favor down to $20 or $40 and carried certificates of deposit in his pocket for thousands of dollars because it was easier to handle currency than to draw checks. This account with the American Trust and Savings Bank ran in the joint name until May, 1901, when it was closed in consequence of one of the alleged frauds perpetrated by respondent.

On May 4, 1901, respondent deposited in the savings bank, to the account of Brown & Oakley, a check for $3850, purporting to be signed by one C. A. Nelson and drawn on

the Commercial National Bank of Chicago. This check was dated May 3, which was Friday. On Friday, the day of the date of this check, respondent gave to A. C. Frost & Co. his check in the name of Brown & Oakley, drawn on the American Trust and Savings Bank, for $2475, and received from Frost & Co. two checks,—one for $150 and one for $300,—and stated at the time that he did not need $2000 of the money until the following Monday. At that time Brown owed Frost & Co., who were bond brokers and did a small banking business, $25, and the checks received by him that day and what he owed Frost & Co. would leave a $2000 balance coming to him. At the time of the arrangement with Frost & Co., Brown represented that he had a large transaction on hand, which would result in his having several thousand dollars in a few days, and Frost & Co. agreed to receive his check, make the advancement and pay the balance of $2000 on the following Monday, upon the explanations of Brown aforesaid. This check to Frost & Co. was deposited on Saturday, the same day that respondent deposited the $3850 check of Nelson. On the same day that respondent deposited the Nelson check he deposited the $300 check of Frost & Co., a check from another party for $150 and currency to the amount of $130. On Monday following he called upon Frost & Co. for the remainder of the check that he had given and they offered to give him a check for the amount but he stated that he did not want a check but wanted the currency, as he did not desire that the check should go through a bank. Frost & Co. gave him the $2000 in currency and he went to the American Trust and Savings Bank and withdrew $645 in currency. At the time Brown gave Frost & Co. his check for $2475 there was only $30 to the credit of Brown & Oakley in that bank. On Monday morning, at the time he drew the $640 from the savings bank, he had a credit of $4460, the principal part of which was the $3850 Nelson check. The Nelson check was not sent to the clearing house until Monday, and when it was sent it did

not clear, but was returned with the statement that C. A. Nelson had no account with the Commercial National Bank. The bank claims it was not deposited in time to be cleared on Saturday; that on that day the clearing is done early in the morning, from 9:30 to 10 o'clock, and that this deposit was not made until after the checks and other business had been sent to the clearing house by the bank. Respondent declares that it was deposited soon after nine o'clock Saturday morning and that the bank officials stated that it was in time for clearing, about which matter there is a direct conflict in the evidence. When the savings bank received notice that the Nelson check had not cleared, it notified respondent, and as soon as the check was returned the assistant cashier of the bank took it to respondent, who immediately gave a check of Brown & Oakley to the American Trust and Savings Bank against the Brown & Oakley account for $3850, and respondent kept the Nelson check, saying that he would look up Nelson, the trader, and one J. S. Albright, who was the real owner of the fund represented by the check and to whom he claimed to have paid $2750 on the faith of the check. When the assistant cashier reported to the bank that he had delivered the Nelson check to respondent he was directed by the bank to call upon respondent to get the same, and testified that within an hour of the time he delivered it to respondent he did call upon him for the check, and respondent claimed to have placed it in the hands of a detective named William H. Barton, with instructions to investigate Nelson and Albright.

The claim of respondent is, that respondent, while a member of the legislature of Kansas, in 1891, became acquainted with Barton, who was a detective, and at the same time with Albright, who was lobbying in the legislature; that Barton was in Albright's employ to watch and report the movements of other and opposing book concerns, all of whom were seeking favorable legislation; that after respondent came to Chicago, Albright and Barton frequently

visited him at his office, and that in the winter of 1900-01 Albright employed respondent to effect the settlement of some business matters existing between him and Nelson, the supposed maker of the check; that Albright told respondent that Nelson was stopping at the Palmer House, and insisted that respondent should go to the Palmer House with Albright to meet Nelson and at once enter upon negotiations for settlement; that respondent insisted that the proper way was for him to notify Nelson by letter that the Albright business matter was in his hands for settlement, but that Albright stated that Nelson was quite as anxious to settle as was Albright to have him, and that formalities were unnecessary; that he did go to the Palmer House and met Nelson but did not then make a settlement, and that before the settlement was effected which resulted in the giving of the check, Nelson several times visited the office of respondent; that respondent never wrote to him or made any arrangements with him when to come, other than that at each meeting a future time of meeting was fixed; that Nelson was reputed to be a general trader and dealer in stock in the Southwestern country; that after the settlement was made Nelson gave the check and disappeared; that on the day of the date of the check, or the day following, respondent paid Albright $250, and on Monday, before he learned the check had not cleared, he paid him $2500 more and took his receipt for it, and that Albright was to return in a day or so and they were to have a settlement, and that Albright also disappeared and was never after seen by him; that very opportunely, just after the Nelson check had been returned from the savings bank to respondent with payment refused, Barton, the detective, came into his office, and that he gave him the check and supplied him with money and started him in search of Nelson and Albright; that that was the last that was ever seen or heard of Barton.

So far as the evidence shows, Nelson, Albright and Barton, if they ever had any real part in the transaction, so

218 - 20

effectually disappeared that not the slightest trace of them has since been found. Respondent now claims that he was the victim of misplaced confidence, and the bank claims that Nelson was a myth and Albright and Barton were mere mental transferences of individuals known by respondent in Kansas and a fanciful creation of them as actors in this check matter. The savings bank at once employed and set to work leading detective firms, but no satisfactory evidence of the existence of C. A. Nelson was found, and no evidence of the presence of Albright or Barton in Chicago when the check was given or at any other time. Neither of them was ever, so far as the evidence discloses, a guest of any of the hotels in Chicago. Respondent, by his own testimony and that of office-boys and clerks, proved that in the winter and spring of 1901 persons whom respondent called Nelson, Albright and Barton were frequenters of his office, and an oil stock broker testified that on the day that respondent claims to have paid Albright the proceeds of the collection, Albright came to him to purchase stock of some corporation, but did not purchase and disappeared. Outside of the office force no one seems to have ever seen or heard of Nelson.

There was something too peculiar in the series of transactions between Frost & Co. and respondent. Commencing in October, 1900, and extending up to the time of this Nelson check transaction, respondent gave to Frost & Co. a large number of checks. These checks ranged from $150 to $900. They seemed to increase in frequency and size as time progressed. At the same time Frost & Co. would give to respondent their check, respondent would give Frost & Co. his check for approximately the same amount. It appears that the checks given by respondent would be deposited first, but by the time they had reached the clearing house respondent would deposit the check given by Frost & Co. to the credit of the Brown & Oakley account and thus keep his account good. It also appears that his general balance for a long period of time ran from $5 to $65. Respondent claims

that these transactions were interchanges of checks at the request of Frost & Co. to enable them to more easily pass their business through the clearing house, while they, on the other hand, claim that all the checks so given by them to respondent were advancements and loans to him, for which he would give his check. Whatever may have been the real transactions between Frost & Co. and respondent, it is quite apparent that the effect of the transactions was to make respondent's bank account appear to be a very active and substantial one although the final balance would not be great, and that such amount of business would have the tendency to lull the savings bank into a feeling of security as the size of the checks increased and were promptly met.

Respondent did prove by the testimony of three or four witnesses that a party by the name of William H. Barton, or "Billy" Barton, who claimed to be a detective, was known to them, and by some of them who were rooming-house keepers that he roomed with them about the time and date of the transaction in question; but the character of these witnesses is such and the attack upon their credibility was so strong that it may well be doubted if they could be believed if there were no other circumstances casting discredit upon their statements. But there was one circumstance that was developed in the proceeding that seemed to stamp the claim of good faith of respondent as untrue. It developed by the testimony of three witnesses that in the spring of 1905, and after this information had been filed and respondent was facing the hearing, he felt it necessary to establish the existence and presence in Chicago of the alleged detective, William H. Barton, and that he went to Charles T. Haas, of the Haas detective agency, and told Haas, to use the language of respondent, that he had "flim-flammed" the savings bank out of a lot of money; that Barton was a myth and that it was necessary for his defense to have the identity and existence of Barton established, and that he would pay Haas $200 if he would produce witnesses meeting the re-

quirement. Haas pretended to accede to his proposition and notified the relator of it, and the matter progressed until, under the direction of respondent, it was agreed that Haas and two of his clerks should falsely swear that Barton had worked for Haas along about and prior to the time of his disappearance, and that the books of Haas would be, and were, changed so as to show work done by Barton and the time the same was done for Haas; that each of the parties should give a description of Barton, and that each should claim to have seen Barton on the day that he received the Nelson check from respondent, and should say that a large check was exhibited to him or her by Barton, and they had been told of Barton's employment to search for Albright and Nelson; that each should testify to all those matters, but that they should avoid having too exact correspondence in their statements, so that it would not appear that their evidence was concocted. At the hearing Mr. Haas was called upon the stand by respondent, and to respondent's surprise stated that he never did know Barton, and later gave a full detail of the attempt and agreement on the part of respondent to suborn him and his two clerks, and in this he was corroborated by three of the clerks and other circumstances. Respondent insisted that this evidence was incompetent and asked to have it stricken, and now insists that it should not be considered. In this contention respondent is in error, as it is in the nature of an admission on his part that there was no such person as William H. Barton in any manner really connected with that transaction, and that in order to make his defense it was necessary that it should falsely appear that such party did exist and was concerned in the transaction. *Chicago City Railway Co.* v. *McMahon,* 103 Ill. 485; 1 Elliott on Evidence, sec. 226.

In this last matter respondent again claims that he is the victim of a conspiracy on the part of the lawyers prosecuting the information and of the Haas detective agency, and attacks the reputation of Mr. Haas and his clerks. The relator

offered evidence supporting the reputation of Mr. Haas, and we think the evidence clearly establishes the credibility of Mr. Haas and shows that respondent is guilty of attempting subornation of the witnesses, and is also guilty upon the general charge of defrauding the bank.

The other count of the information charged respondent with engaging in a scheme to obtain property by false pretenses and carrying out the scheme. The information charges that under this scheme he obtained two automobiles,—one a "Rambler," from Thomas B. Jefferey & Co., of the value of $1200, and the other an "Austin," from Mason, Harvey & Co., of the value of $2500.

The evidence shows that for many years respondent had been greatly indebted and that there were many judgments against him both in courts of record and in justices courts and that he was being pursued by his creditors. He had a brother-in-law named Norton Hamlin, who was not and had not for many years been a resident of this State, and who was a brakeman and conductor at various times on a railroad. In order to protect his property against creditors he gavé to Norton Hamlin a chattel mortgage for several hundred dollars upon his household goods and office furniture and law library. He claims that his indebtedness to Norton Hamlin amounted to $2000 or more and that he paid him on the indebtedness more than $1000. Norton Hamlin assigned the mortgage and securities held by him to one Louis F. Hopkins, whose business was loaning money on chattel mortgages and salaries. In March, 1903, respondent claimed to have sold his household effects and office furniture and library to one S. H. Smith, a supposed lawyer from Ohio, subject to the Norton Hamlin mortgage. He testified that soon after the sale he discovered that Smith was attempting to remove the property, and that he stopped him from doing so and that Smith fled; that still apprehending that Smith might in some manner get away with the property although in his own possession, respondent caused a bill to be filed

in the name of Hamlin against Smith, setting up the mortgage and the supposed sale and asking to have a receiver of the goods appointed, and through some arrangement respondent himself was appointed receiver of the goods, and being in custody of his goods as receiver he prevented creditors and officers from taking his goods by presenting to them his order of appointment as receiver and challenging them to interfere with the goods at the risk of being proceeded against for contempt. While thus acting as receiver of his own goods he contracted for the "Rambler" automobile on the 30th day of June and for the "Austin" automobile on the 6th day of August, both in the year of 1904. He represented to the dealers that he did not have the money to pay for them but that he had a client who was worth from $25,000 to $50,000 and who owed him $2700 or more for legal services, and that she would go his security for the machines. The alleged client was one Katherine Fay. Katherine Fay was unknown to the dealers, and they had to rely upon the representation made by respondent and the references given by him as to her financial responsibility. In each instance he took the machines subject to the investigation to be made by the dealers resulting in ascertaining that Katherine Fay was financially responsible, and agreed to hold the machines as the property of the dealers until the matter should be ascertained. On the same day that he received the "Rambler," which was on Saturday, July 30, 1904, he made a mortgage on the same to Louis F. Hopkins for $900. It was acknowledged and recorded the following Monday, and on the same Monday he gave a mortgage to Callaghan & Co. for a law books account and one to the Exchange Building trustees for office rent. These two mortgages were not acknowledged or recorded. After obtaining the "Austin" machine, and before the securities could be investigated, he represented to the dealers that it was necessary that he should know the number of the machine, which did not appear upon it, and that he should have some evi-

dence that he owned it, intimating that it was necessary to have the machine insured, and obtained from the dealers a receipt for the note which he had given for the machine and a bill of sale describing it. On the same day that he received this paper he executed a chattel mortgage on the "Austin" machine to one Seaver for $400, a second mortgage to his brother-in-law, Norton Hamlin, and also a mortgage to Callaghan & Co. He placed both of the machines in the garage of one Canary, in custody of one Endicott, who was to rent them and drive them and receive one-half of the income from them for his services. He then succeeded in having both the machines put within the receivership. Although the Norton Hamlin claim had been assigned to Hopkins, yet respondent claims that the mortgage to Hamlin was to secure Hamlin that claim, and also claims that the $400 represented by the Seaver mortgage was cash borrowed by him, and that he paid $225 of that to Norton Hamlin. It was afterwards ascertained that Katherine Fay was a straw-bond woman and financially irresponsible. The dealers sought to get their machines back, when they were confronted with the chattel mortgages and receivership, and could not do so. When the condition of things was brought to the attention of the court respondent was removed from the receivership, and upon the hearing in the receivership proceedings the court found that the whole proceeding was fraudulent, and that respondent had intentionally brought about the situation for the purpose of obtaining property through fraud and had so obtained the two automobiles, and at the same time the court ordered that respondent be not allowed to prosecute causes nor file papers in the court without the court's permission.

Respondent claims that he was imposed upon by Katherine Fay and believed her to be worth a large amount and as good security as he represented her to be, and that there was no wrongful intent in anything he did in the transactions as to the automobiles, and his being appointed receiver

was done at the request of the holders of claims against him. Although he claims to have known Katherine Fay was possessed of a great deal of property, a large portion of which was real estate, he did not in his testimony point out a single piece of property that she ever owned, nor does he disclose what business he transacted with Katherine Fay that resulted in her owing him so much money. It is incredible to believe that a lawyer laboring under the financial difficulties which respondent was, would do so much business for any one without actually knowing something about the financial responsibility of his client. Respondent denies that he made any representation as to the financial worth of Mrs. Fay, and denies that there were any conditions to the sales except in the case of the "Rambler," which he admits he was to hold until Tuesday or Wednesday of the week following his purchase, for the investigation of the dealers. The chancellor before whom the receivership case was tried reached a conclusion adverse to this contention, and while we have not the evidence before us that was before the chancellor, we have the evidence reported to this court upon the matter and are forced to the same conclusion reached by the chancellor. From the evidence it would seem that respondent was reckless in the matter of his expenditures and the manner of his living and indifferent to the condition of his credit. No good purpose can be effected by going into all the details as disclosed by the evidence and the various contentions made.

Our conclusion is that respondent is guilty of the charges preferred against him in the information, and that he is an unfit man to be allowed to further conduct the business and exercise the rights and functions of a lawyer in this State. The rule, therefore, will be made absolute, and the name of the respondent will be stricken from the roll of attorneys and he will be debarred from further practice as such.

*Rule made absolute.*